WILMA MARTIN v. THE TOWN OF McMINNVILLE
and McMINNVILLE ELECTRIC SYSTEM.
—369 S. W. (2d) 902.

Middle Section, Nashville. July 27, 1962.

Certiorari Denied by Supreme Court May 10, 1963.

504

Cornelius & Collins, Nashville, for Rockford Textile Mills, Inc.

. Haston & Haston, McMinnville, Jim Camp, Lucius H. Camp, Sparta, Harry W. Camp, McMinnville, for the Town of McMinnville and McMinnville Electric System.

W. G. McDonough, McMinnville, McAllen Foutch, Smithville, for Wilma Martin.

## I

SHRIVER, J. This is a suit for the wrongful death of Henry J. Martin, brought by his widow, Wilma Martin, against the Town of McMinnville and McMinnville Electric System.

The case was tried on October 30, 1961, and resulted in a jury verdict for the plaintiff in the amount of $13,600.00 which was approved by the Trial Court. It was then duly brought to this Court by an appeal in error and assignments have been filed.

To defendant's special pleas plaintiff filed a replication which raised the issue, among other things, that the defendants were barred from relying upon contributory negligence because of wilful and wanton negligence on their part.

## II

### Assignments of Error

There are three assignments of error, the first of which is that the Court erred in refusing to grant defendants' motion for a directed verdict at the end of all the proof on the ground that plaintiff's intestate, Henry J. Martin, was guilty of such contributory negligence as a matter of law as to bar a recovery.

The second assignment charges error in refusing to grant a directed verdict for defendant on the ground that the acts of the Rockford Textile Mills in sending the plaintiff's intestate on the roof of their building in violation of Section 53-2802 et seq. T.C.A., was such an

independent intervening cause as to relieve the defendants of liability.

The third assignment is that there was no evidence of negligence on the part of the defendants upon which a jury verdict could be predicated.

## III

The deceased, Henry J. Martin, was a skilled carpenter, age 52 years, 6 feet tall, a substantial wage earner and a man of good character.

At the time of his death Mr. Martin was working for the Rockford Textile Mills in McMinnville where he had been employed for some time. The deceased was electrocuted on April 11, 1960 while on the roof of a loading dock at Rockford Textile Mill and while he was measuring the roof to install a gutter. Prior to and at the time in question Rockford Textile Mills was supplied its electricity by the defendants through wires leading to transformers mounted on poles on a vacant lot owned by the said Textile Mills and adjacent to its plant. Electric wires also led from the transformers to the plant building over said vacant lot. The Textile Mills first built on this vacant lot a loading platform attached to its building, which platform was partially under the transformer apparatus of the defendants. Subsequently the loading platform was enclosed and a roof built over same which was about sixty-five inches directly below the wires of the defendants which were uninsulated and exposed and which carried approximately 7200 volts of electricity.

The enclosure was built by the employees of Rockford Textile Mills and the deceased did some of the carpenter work on it. He was electrocuted when he came in contact

with this exposed wire extending from a pole beside the loading dock across the roof of said dock to the west wall of the Textile Mill.

The electric poles, transformers, meters and the exposed wires were all owned by the defendants and were used and operated by them to provide electricity to the Rockford Textile Mills main building.

In the fall of 1958 when the officials of the Textile Mills decided to enclose the loading dock by putting a roof over it the defendants were notified of this plan and the maintenance superintendent of the mills talked to the electrical engineer of defendants on at least two occasions about the plans, so that defendants had full knowledge of the situation, and the superintendent of the mills understood that the defendants were going to correct the condition with respect to these high voltage wires but this was not done until after Mr. Martin's death.

After the roof over the loading dock was built, agents of defendants moved the electric meter from inside the enclosed dock and put it on a pole outside but did nothing toward insulating the wires above the roof or relocating them.

In November 1959 defendants changed the size of the transformer on one of the poles beside the loading dock and changed the size of the wiring running across the roof leaving it 65 inches from the top of the roof and placing or replacing exposed or uninsulated wires at this height above said roof.

The manager of the defendants testified that a wire such as this could be made safe by properly insulating it. He also testified as to his familiarity with the National

Electrical Code and its requirements, part of which were that uninsulated wires be not less than 8 feet from the highest point of a roof when carrying more than 600 volts of electricity.

The witness, John Morton, who was acting as maintenance superintendent for Rockford Textile Mills on the day of Mr. Martin's death, and who was an electrician by trade, sent the witness Herbert Martin on the roof to fix a window and later sent Henry Martin, the decedent, on the roof to measure for a gutter. When Herbert Martin went on the roof he was cautioned by Mr. Morton about the live wire but we do not find any evidence that Henry Martin was present at the time this caution was given, and Mr. Morton testified that he had no recollection or talking to Henry Martin, the deceased, or cautioning him about the wire before he went on the roof the day he was killed.

Herbert Martin, testified that he and Henry Maritn had talked about this being a live wire over the roof some four months prior to the day on which Henry Martin was killed but stated that he did not know whether or not Henry Martin knew the wire was still uninsulated or had not been fixed at the time of the accident.

Mr. Morton, the superintendent, testified that he himself did not know the voltage in this wire and, so far as he knew, neither Henry Martin nor any of his other personnel knew the voltage in these wires. Mr. Morton also testified that alternating current such as that being transmitted by the wire in question goes around or in circles about the wire and if a person gets within the circuit of the current it will strike him.

Herbert Martin further testified that the deceased asked him to help with the measuring of the roof for a gutter and he took one end of the steel tape to help the deceased measure the room. When he (the decedent) had completed measuring the edge of the building he raised up into proximity of the wire either touching it or coming close to it with his head and he received an electrical shock which killed him almost instantly.

Mr. John Morton, Supervisor for Rockford Textile Mills, said that he did not call the McMinnville Electrical System or the Town of McMinnville to tell them that he was going to have a man on the roof working in proximity of the live wires.

## IV

■■ Proposition No. 1, advanced by defendants is that plaintiff's intestate was guilty of contributory negligence which proximately caused his death and that the Trial Court should have directed a verdict in favor of the defendants on the ground that the right of action was barred as a matter of law because of this contributory negligence. Counsel rely on the City of Chattanooga v. Shackleford, 41 Tenn. App. 734, 298 S. W. (2d) 743, and other cases as supporting this proposition.

In that case it appears doubtful whether there was any actionable negligence on the part of the City of Chattanooga since wires were placed within a lawful distance from the roof of the building that they crossed. Commenting on the facts of the case Judge Howard, speaking for the Eastern Division of the Court of Appeals, stated that the decedent was an intelligent man with 17 years experience as a roofer; that he not only knew of the location of the wires, but was cognizant of

their danger. His helper, Thomasson, testified that when the decedent was about halfway up the ladder with the new guttering on his right shoulder he said to Thomasson, who was on the roof removing the old guttering, "Watch them wires", and Thomasson replied, "You had better be the one to watch them, cowboy."

Despite decedent's knowledge of the presence and danger of the wires, on reaching the top of the ladder he tilted the guttering downward and started pushing it back over his right shoulder until it came in contact with the high voltage wire, resulting in his death.

The Court then stated, "Under the circumstances, it is apparent that the decedent knowingly placed himself in a position of danger, and we think his failure to exercise ordinary care for his own safety was the sole and proximate cause of his death."

We think that the Shackleford case is distinguishable in some degree from the case at bar, in that (1) The defendant Electric Company in the case at bar knowingly maintained the uninsulated wires which caused decedent's death, within a little over five feet from the roof of the building and continued to maintain this dangerous wire carrying some 7200 volts of electricity for several years contrary to the rules and regulations which it recognized as controlling such a situation.

(2) While it does appear from the record that the decedent was aware that the wire was dangerous because of its charge of electricity, nevertheless, the proof in this record leaves some question of doubt as to whether or not he may have supposed that the defendant company had corrected the situation prior to the time he was injured.

Another circumstance which enters into the question of his contributory negligence, is that he may or may not have come in actual contact with the wire that carried the deadly charge into his body. The evidence leaves some doubt on this point and neither Mr. Morton, the man in charge of operations at the plant, nor any of the other employees apparently knew that there was such high voltage of electricity in this wire that it would arch for some distance to make contact if one came close to it. The decedent may have brought his head in proximity to the wire and have been killed without actually touching it and without knowledge of the danger just mentioned.

In Kingsport Utilities v. Brown, 201 Tenn. 393, 299 S. W. (2d) 656, 69 A.L.R. (2d) 87, it was held that high voltage power lines must be insulated where persons are likely to be, and have a right to be. In that case the National Electrical Safety Code was introduced into the record and it was pointed out that it provided for a minimum vertical clearance of 20 feet on open supply lines carrying 750 to 15,000 volts in public streets, alleys or roads in urban or rural districts.

Exhibit No. 1, in the instant record is Regulation No. 15, of the Department of Insurance and Banking of the State of Tennessee, Division of Fire Prevention, which provides that the National Fire Code volume 5, National Electrical Code, is adopted as the required minimum standard for material, installation, etc. in Tennessee. These regulations, it is admitted require that open conductors such as those that killed Mr. Martin shall not be less than 8 feet from the highest point of roofs over which they extend. It is pointed out in City of Chattanooga v. Shackleford supra, that distributors of electricity are required to use the highest degree of care to

protect persons who may come in contact with wires. And in International Harvester Co. v. Sartain, 32 Tenn, App. 425, 222 S. W. (2d) 845, it was held that the duty of the electric companies to exercise due care extends to every place where persons have a right to be for business, convenience or pleasure.

And in Walpole v. Tennessee Light & Power Co., 19 Tenn. App. 352, 89 S. W. (2d) 174, it was held that an electric wire must either be insulated or so located as to be harmless, especially where the wire is placed among trees, and, in an action for injuries received when an iron pipe which plaintiff was lifting from a well came into contact with the high tension wire 23 feet and 1 inch from the ground over the well, evidence of defendant's negligence in failing to place the wire a greater distance from the ground was held to be for the jury, and it was also held that it was a jury question as to whether or not the plaintiff was guilty of contributory negligence so as to bar his recovery.

It is urged by counsel for the plaintiff that where the defendants' negligence is gross, wanton or takes the color of wilfulness it cannot rely upon contributory negligence of plaintiff. Citing Shuler v. Clabough, 38 Tenn. App. 333, 274 S. W. (2d) 17; McConnell v. Jones, 33 Tenn. App. 14, 228 S. W. (2d) 117; Neal v. Midgett, 28 Tenn. App. 520, 198 S. W. (2d) 32, and Johnson v. Alcoa, 24 Tenn. App. 422, 145 S. W. (2d) 796.

We think there is considerable substance in the contention that this rule should be applied in this case, and we believe there is enough room for a difference of opinion among reasonable men as to the conclusions to be

drawn from the evidence as to require submission of this cause to a jury.

It is a well known rule that on a motion for a directed verdict plaintiff is entitled to the strongest legitimate view of the evidence in his favor supported by all reasonable inferences therefrom, and if any reasonable doubt as to the conclusions to be drawn from the whole evidence exists then there is a question for the jury. Lackey v. Metropolitan Life Ins. Co., 30 Tenn. App. 390, 206 S. W. (2d) 806; Poole v. Bank, 29 Tenn. App. 327, 196 S. W. (2d) 563 and many cases.

It results that the assignments based on contributory negligence of the decedent are overruled.

But it is contended that Rockford Textile Mills violated Code Section 53-2802 et seq. by sending the decedent upon the roof when the power line was within 6 feet of the roof without notifying the defendants of the work to be done and that this constituted an independent intervening cause relieving the defendants of liability.

It is to be pointed out that defendants were ordered to plead their defenses specially and that the special pleas did not include Code Section 53-2802 as a defense but only Code Section 53-2803 et seq. and it is insisted by plaintiff that defendants cannot now insist that the trial Court was in error in not directing a verdict on this proposition.

In any event, we agree with counsel for the plaintiff that Chapter 28 of Title 53 was not intended to relieve a company transmitting deadly energy through uninsulated wires from the consequences of its negligence, but that the law was designed merely as an additional safety

measure. It cannot be successfully argued that the defendants in the instant case could not have foreseen that an injury such as this might occur from their continued violation of the rules and code which they were required to observe.

Therefore, the assignment of error on this ground is overruled.

There is no substance in assignment No. 3, that there was no substantial evidence of negligence on the part of the defendants and this assignment is overruled.

It results that all assignments of error on behalf of the defendants, Town of McMinnville and McMinnville Electric System are overruled and the judgment against them is affirmed.

## V

We now consider the assignment of error filed on behalf of plaintiff-in-error, Rockford Textile Mills, Inc., for the use and benefit of Queen Insurance Co. of America, which presents the question whether the liability of the employer-insurer for $12,500.00, payable at the rate of $112.48 each four weeks, shall be credited with the whole recovery ($13,600.00) or by the net amount remaining in the hands of the plaintiff-employee after paying the attorney's fees fixed by the Court.

Rockford filed an intervening petition in the Court below for the purpose of asserting certain subrogation rights vested in the petitioner under the Workmen's Compensation Act of Tennessee because of payments made to the plaintiff, Mrs. Wilma Martin, by said insurance carrier under said Act.

It appears from the intervening petition that petitioner

through its insurer agreed to pay the plaintiff, Wilma Martin, a sum not exceeding $12,500.00 at a certain specified rate and certain medical and burial expenses and that Wilma Martin was paid benefits at the rate of $28.12 a week, payable each four weeks in installments of $112.48 each. It was found by the Court below that benefits aggregating $2,837.56 had been paid as of December 29, 1961, the date of the Court's final order.

The petitioner prayed (1) that it be given a lien on the plaintiff's judgment of $13,600.00 against the defendants to the extent of the payments made by the petitioner under the Workmen's Compensation Law and (2) that the Court fix the fee payable to plaintiff's attorneys in effecting a recovery on behalf of petitioner of the amount of Workmen's Compensation Benefits paid by petitioner to the plaintiff and (3) that petitioner be given credit for the amount collected by plaintiff from the defendants in excess of the aggregate of Workmen's Compensation Benefits paid the plaintiff.

On December 29, 1961 the Trial Judge entered a decree wherein it was recited that plaintiff's attorneys had rendered valuable services in this case to both the plaintiff and the petitioner and that they were, therefore, entitled to a reasonable attorneys' fee for their services and that one third of $13,600.00 was a reasonable fee, which amounted to $4,533.33, and this was declared to be a lien on the judgment in accordance with Title 29, Sec. 202 of the Code.

We are of opinion that the answer to the question raised by the assignment depends on the proper construction of Section 50-1019 T.C.A. enacted as a part of the original Workmen's Compensation Act but amended in

1957. As carried in the 1962 Cumulative Supplement to T.C.A. it is as follows:

"The fees of attorneys and physicians and charges of hospitals for services to employees under the Workmen's Compensation Law shall be subject to the approval of the county judge or chairman of the county court, or other court before which the matter is pending; provided, that no attorney's fees to be charged employees shall be in excess of twenty per cent (20%) of the amount of the recovery or award to be paid by the party employing the attorney; provided further that in all actions brought under this section the attorney bringing the action in behalf of the employee and effecting a recovery on behalf of the employer or his insurance carrier shall be entitled to a reasonable attorney fee to be fixed by the court and based solely upon the amount recovered and collected on behalf of the employer or his insurance carrier. Any fee paid upon the amount recovered in excess of the amount paid by the employer or his insurance carrier shall be paid by the employee for whose benefit the action is brought in accordance with his contract with his attorney."

Having in mind that the law provides that the fee shall be fixed in reference to the amount of the liability of the employer or insurance carrier under the Workmen's Compensation Act, the intent of the Act, which placed the fees of attorneys, physicians and hospitals under the supervision of the courts, was to spell out that the attorney, whose services are spoken of in the amendment as being in behalf of the employer or his insurance carrier, shall be entitled to an attorney's fee based on the amount of the recovery inuring to the benefit of the employer

or his insurance carrier, payable from the employer-insurer part of the recovery, with the same to be fixed by the courts.

In our opinion this act contemplates that, with the respect the amount of the recovery to which the insurance carrier or the employer is entitled to subrogation under Code Section 50-914, ($12,500.00 in this instance) it shall be the duty of the Judge to determine and fix a reasonable fee. But that with respect to the excess ($1,100.00 in this instance) the contract between the attorney and his client shall determine the fee.

This seems clear from the language in the Code Section providing:

"The attorney bringing the action in behalf of the employee and effecting a recovery on behalf of the employer or his insurance carrier shall be entitled to a reasonable attorney fee to be fixed by the court and based solely upon the amount recovered and collected on behalf of the employer or his insurance carrier."

If the whole recovery is to be credited on the insurer's liability, there would seem to be no point in having the Court fix the fee. It seems to us that this provision is to protect the insurer who needs no protection if it is not liable for the fee.

Another purpose of the Act accomplished by the last sentence of the amendment, is to leave the amount of the attorney's fee with respect to any excess of the recovery over the Workmen's Compensation Liability of the employer or insurance carrier, subject to the contract of the attorney with the plaintiff employee.

We do not find any language in the Act to sustain the construction that the part of the attorney's fee the employer or insurance carrier must pay is to be determined by reference to the weekly or monthly payments made by the employer or insurance carrier on the total liability. To so construe the Act would result in a lack of uniformity since, under this construction, the part of an attorney's fee that an employer or insurer would have to pay would depend on the time elapsing and the payments made between the employee's recovery under the Workmen's Compensation Act and a recovery on a tort claim.

■ Therefore, we fix the fees of the attorneys for plaintiff, insofar as the recovery is in behalf of the employer or insurance carrier, at one third of $12,500.00 or $4,166.66. With respect to the $1,100.00 balance of the recovery, the contract of the attorneys with the plaintiff shall prevail.

The net amount of $8,333.34 shall be credited on the liability of the employer-insurance carrier, to the extent of the total amount of the monthly payments to date, and to the extent the balance discharges said monthly payments as the same come due. At the end of the total four week, or monthly periods so discharged, employer-insurance carrier shall resume the monthly payments until the balance of the $12,500.00 liability is discharged.

■ Where, as in this case, the amount of the recovery is in excess of the employer-insurance carrier's liability, we have considered whether the employer-insurance carrier is subrogated to this excess, and have decided that it is not since T.C.A. sec. 50-914 expressly provides that the employer shall be subrogated to the extent of the amount paid or payable under the Workmen's Compensation Act.

We think the intent of Section 50-1019 is to make the employer-insurance carrier liable for attorneys fees by treating the recovery up to the Workmen's Compensation Liability as in behalf of the employer-insurer, which it actually is, and it would defeat this legislative purpose to allow the employer-insurer to recoup his attorney's fees out of the excess part of the recovery going to the employee.

It therefore results that the assignments of error are overruled and judgment below as modified hereinabove, is affirmed.

Modified and affirmed.

Humphreys and Chattin, JJ., concur.